# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| JAMES HARRIS, | ) | CASE NO. 1:19-cv-2180 |
| | ) | |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| PENTAIR FLOW TECHNOLOGIES, LLC, | ) | |
| | ) | |
| | ) | |
| DEFENDANT. | ) | |

Before the Court is the motion of defendant Pentair Flow Technologies, LLC ("Pentair") for summary judgment. (Doc. No. 29 (Motion); Doc. No. 30 (Memorandum in Support).) Plaintiff James Harris ("Harris") opposes the motion (Doc. No. 34 (Memorandum in Opposition)), and Pentair has filed a reply (Doc. No. 38 (Reply)). For the reasons that follow, the motion is granted and the case is dismissed.

## I. BACKGROUND

Harris is a 73 year old individual who has worked in foundries and operated forklifts (aka tow motors) since 1968. (Doc. No. 35 (Affidavit of James Harris) ¶¶ 2, 4; *see* Doc. No. 28-1 (Deposition of James Harris) at 14[1], 30–31.) Pentair is a water treatment company that provides water treatment services to commercial and residential customers. (Doc. No. 30-1 (Affidavit of

---

[1] All page number references herein are to the consecutive page numbers applied to each individual document by the Court's electronic docketing system.

Elizabeth Hite[2]) ¶ 2.) Pentair also "manufactures castings for its pumps through a foundry located in Ashland, Ohio." (*Id*. ¶ 3.) Harris began working for Pentair at its foundry in 2007 and was employed in his most recent position as a forklift operator from June 2017 until his termination on August 30, 2018. (Doc. No. 28-1 at 14, 16; Doc. No. 32-1 (Deposition of Elizabeth Hite) at 53; Doc. No. 32-2 (Hite Deposition Exhibits) at 10; Doc. No. 35 ¶¶ 3, 5.) Though Harris denies that he received any training from Pentair on the safe use and handling of a forklift, company documentation shows that he was administered periodic tests addressing forklift safety.[3] (Doc. No. 28 at 29, 205–10.) Harris's supervisor, Shane Fortney, also completed periodic coaching of Harris while he was performing his job. (Doc. No. 31-1 (Deposition of Shane Fortney) at 20.)

Pentair is a signatory to a collective bargaining agreement ("CBA"). (Doc. No. 30-1 ¶ 5.) Pursuant to the terms of the CBA, Pentair has the right to institute, implement, and enforce rules and regulations that govern the work at its facilities. (Doc. No. 28-1 at 23–24, Ex. 3 (CBA) beginning at 133.) Employees are entitled to grieve any disciplinary action associated with Pentair's enforcement of its rules and to a "just cause" determination before termination. (Doc. No. 28-1 at 21, 23, 27, 146–50.) Consistent with these rights, Pentair has promulgated Factory Rules & Safety Regulations to govern its facilities. (Doc. No. 28-1 at 23–24, 203–04.)

Where feasible, Pentair employs progressive discipline, including verbal warnings, written warnings, and suspensions, before proceeding to discharge. (Doc. No. 31-1 at 29–30;

---

[2] Hite is employed by Pentair as a human resources generalist and has responsibilities for Pentair's Ashland Foundry where Harris was employed. (Doc. No. 32-1 (Deposition of Elizabeth Hite) at 8.)

[3] Additionally, Harris testified that he was well-versed in the safety rules governing the operation of forklifts, including the requirement that the forks were to be maintained at the lowest safe height when the truck was in motion. (Doc. No. 28-1 at 30–31.)

Doc. No. 32-1 at 29–30.) However, Pentair reserves the right to impose a more severe penalty, without resorting to the progressive discipline scheme, depending on the severity of the specific violation. (Doc. No. 32-1 at 30; *see* Doc. No. 28-1 at 35, 204; *see, e.g.,* Doc. No. 28-1 at 251.) Typically, when a disciplinary issue is brought to the attention of management, Pentair gathers statements from any potential witnesses and the supervisor and then the information is supplied to the company's human resources department. (Doc. No. 32-1 at 31.) Where a violation is witnessed by a supervisor, the investigation is often limited to the supervisor committing his observations to writing and permitting the employee, if he so desires, to grieve the resulting discipline. (Doc. No. 31-1 at 23–24.)

The record demonstrates that, after Harris bid for and received the forklift operator position, he was subjected to repeated disciplinary actions for violating safety and other work rules relating to forklift operation. Fortney testified that he initially provided Harris numerous verbal counseling and coaching sessions regarding Harris' alleged unsafe operation of his forklift. (Doc. No. 31-1 at 20–22.) On July 19, 2017, Fortney issued Harris a written warning for violating a safety procedure. (*Id*. at 42; Doc. No. 28-1 at 251.) Specifically, Harris was charged with failing to check his surroundings as he was operating his forklift and striking another employee who was walking into the grind room. (Doc. No. 28-1 at 251.) Harris was advised that his failure to correct his behavior would result in additional disciplinary action, up to and including discharge. (*Id*.)

Two weeks later, on August 7, 2017, Fortney allegedly observed Harris operating his forklift without wearing his seatbelt, which is another safety violation. (Doc. No. 31-1 at 47; Doc. No. 28-1 at 252.) According to Fortney, because he did not want to issue Harris a

3

suspension under Pentair's progressive disciplinary scheme, he downgraded the July 19, 2018 written warning to a documented counseling. (Doc. No. 31-1 at 49–50; *see* Doc. No. 28-1 at 252.) Harris was advised, however, that the next time he violated a safety procedure, he would be subject to a disciplinary suspension. (*See* Doc. No. 28-1 at 252.) Harris was also cautioned that two more rules violations could result in his discharge.[4] (*Id.*)

On October 20, 2017, Harris received a written warning for running over a wind break curtain in the grinding area, causing damage to the curtain and his forklift truck. (Doc. No. 31-1 at 50–51; *see* Doc. No. 28-1 at 285.) Harris had previously received a verbal warning for running over the curtain. (Doc. No. 31-1 at 51.) Thereafter, Fortney reminded Harris that any additional violations would result in further discipline, up to and including discharge. (*Id.*; *see* Doc. No. 28-1 at 285.)

On October 26, 2017, Harris was allegedly observed by a member of the safety walk team operating his forklift with his forks approximately two feet off the ground. (Doc. No. 31 at 52–53; *see* Doc. No. 28-1 at 286.) Fortney advised Harris that he was operating his forklift at an improper height and that the forklift's forks should not be more than 3 inches from the ground when the vehicle is in motion. (Doc. No. 31-1 at 52; *see also* Doc. No. 28-1 at 286.) Two weeks later, on November 3, 2017, Fortney allegedly observed Harris driving his forklift with his forks one foot off the ground. (Doc. No. 28-1 at 286.) Because Harris had received three formal disciplinary assessments within the previous four months (*see id.*), Harris was suspended for two days. (*Id.*) Harris' then-acting supervisor, Jay Olney, advised Harris, as reflected in the formal

---

[4] Fortney testified that he recommended to Harris that he consider bidding on a job within the foundry that did not involve the operation of forklifts. (Doc. No. 31-1 at 36; *see* Doc. No. 28-1 at 252.) Though Harris denies that this conversation took place, he does not deny that the discipline form suggests it. (Doc. No. 28-1 at 49; *see id.* at 252.) This factual dispute is not material to the issues on summary judgment.

disciplinary notice, that if he continued to violate safety procedures, he would face discharge. (*Id.*)

On July 18, 2018, Harris received another written warning because Fortney allegedly observed him sleeping on his forklift in the grinding department during working hours. (Doc. No. 31-1 at 56; *see* Doc. No. 28-1 at 287.) Fortney testified that he had previously observed Harris sleeping on the forklift and had awakened him several times. (Doc. No. 31-1 at 56.) On this occasion, Fortney located the Plant Manager, Mike Taylor, so that he could witness Harris sleeping on his forklift before he woke him. (*Id.* at 56–7.) While Pentair maintains that it could have discharged Harris for this offense, the company elected not to do so at that time. (Doc. No. 30 at 14.)

Harris denies that he committed any of aforementioned safety and rules violations. (Doc. No. 35 ¶¶ 7, 10 ["I was not asleep on the tow motor as alleged. I would never sleep on a tow motor."], 18 ["I never operated my tow motor without wearing my seatbelt as alleged."]; Doc. No. 1 (Complaint) ¶ 16 [noting that he "disputed and continues to dispute the [false] reasons given for the discipline he received"], ¶ 15 [noting that the reasons given were "false"]; ¶ 19 [Harris "disputes any and all previous disciplines . . . as baseless, untrue, unjustified, discriminatory and contrary to law"]; *see* Doc. No. 28-1 at 33, 36, 41, 57, 64–65, 67, 71.) He insists that, each time he received a written discipline, he refused to sign the documentation because "they were untrue and had not been investigated as was supposed to occur." (Doc. No. 35 ¶ 8.) He further maintains that, on each occasion, he asked his union to grieve the disciplines, but the union refused to do so. (*Id.* ¶ 9; Doc. No. 28-1 at 21–23.)

According to Harris, "young co-workers and/or management . . . [did not want him] to have the tow motor operator position, which was considered to be one of the better paying and less strenuous positions in the warehouse because the position did not involve a lot of manual labor." (Doc. No. 35 ¶ 6.) He claims that management and these workers "simply did not like [him] and were resentful that they could not prevent [him] from receiving the tow motor position based on [his] seniority which was based upon [his] time on the job." (*Id*. ¶ 21.) As a result, he maintains that "management began to watch [him] more closely than before [he] was awarded the position[.]" (*Id*. ¶ 7.) He insists that the discipline he received, for "false and fabricated reasons[,]" was a result of this increased scrutiny. (*Id*.)

As evidence of this alleged animus, Harris claims that the union president and unidentified "others" inquired of Harris about his retirement plans and commented that "'you know [Pentair] would save a lot of money if you retire.'" (Doc. No. 35 ¶ 11.) Harris reports that "[i]t was clear from these comments, the improper write-ups and different treatment that [he] received that the company was interested in [him] retiring because the company could pay younger, less experienced employees less than [he] was earning." (*Id*.)

On August 28, 2018, Harris was charged with violating another safety procedure when a supervisor allegedly observed him operating his forklift with his forks at an unsafe height.[5] (Doc. No. 31-1 at 62; Doc. No. 28-1 at 288.) Given Harris' disciplinary record, including safety violations relating to forklift operation, Plant Manager Taylor suspended Harris pending an investigation. (Doc. No. 31-1 at 62; *see* Doc. No. 28-1 at 288.) On August 30, 2018, Pentair

---

[5] Harris denies that he committed this violation, as well. (Doc. No. 1 ¶ 19; Doc. No. 35 ¶ 16 ["It was alleged that I operated a tow motor with the forks up too high . . . this is untrue."]; *see also* Doc. No. 28-1 at 65 ["I always had my forks at normal height, always."].)

6

discharged Harris from his employment with the company. (Doc. No. 32-2 at 10.) The letter sent to Harris advised him that his employment with Pentair had been terminated "as a result of the Policy/Procedure, Safety Violations" enumerated in the letter and discussed *supra*. (Doc. No. 32-2 at 10.) Harris claims that, when he was terminated, the union president asked him "very sarcastically 'are you ready to retire now[?]'" (Doc. No. 35 ¶ 11.)

Harris filed the present lawsuit on September 19, 2019. In his complaint, he raised claims of age discrimination under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621, *et seq*. and Ohio Rev. Code § 4112.02, *et seq*. He also raised a state law claim for intentional infliction of emotional distress. (*See generally* Doc. No. 1.) On May 20, 2020, the Court granted Pentair's motion to dismiss Harris' state law claims and denied Harris' motion to amend the complaint. (Doc. No. 15 (Memorandum Opinion and Order).)

Pentair now seeks dismissal of the remaining ADEA claim, arguing that the undisputed facts show that Harris was not discharged due to his age but rather was discharged as a result of his extensive history of safety and rules violations. Harris opposes summary judgment, maintaining that he has demonstrated the existence of genuine issues of material fact relative to whether his discharge for those alleged violations was merely a pretext for unlawful age discrimination.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). A fact is material if its resolution

affects the outcome of the lawsuit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If a reasonable jury could return a verdict for the nonmoving party, then summary judgment is not appropriate. *Id.*

The moving party must provide evidence to the court that demonstrates the absence of a genuine dispute as to any material fact. Once the moving party meets this initial burden, the opposing party must come forward with specific evidence showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *Anderson*, 477 U.S. at 250. It is the nonmoving party's duty to point out specific facts in the record that create a genuine issue of material fact; the trial court does not have a duty to search the record "to establish that it is bereft of a genuine issue of material fact." *Street*, 886 F.2d at 1479–80 (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)); *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992) (citation omitted).

The nonmoving party may oppose a summary judgment motion "by any of the kinds of evidentiary material listed in Rule 56(c), except the mere pleadings themselves[.]" *Celotex*, 477 U.S. at 324, 106 S. Ct. 2548. The Court must view all facts and evidence, and inferences that may be reasonably drawn therefrom, in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962). General averments or conclusory allegations of an affidavit do not create specific fact disputes for summary judgment purposes. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990); *see Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996) (Mere

8

speculation will not suffice to defeat a motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate.")

"Summary judgment requires that a plaintiff present more than a scintilla of evidence to demonstrate each element of a prima facie case." *Garza v. Norfolk S. Ry. Co.*, 536 F. App'x 517, 519 (6th Cir. 2013) (citing *Van Gorder v. Grand Trunk W. R.R.*, 509 F.3d 265, 268 (6th Cir. 2007)). "'The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party].'" *Street*, 886 F.2d at 1477 (*quoting Anderson*, 477 U.S. at 252).

The district court's review on summary judgment is a threshold inquiry to determine whether there is the need for a trial due to genuine factual issues that must be resolved by a finder of fact because those issues may reasonably be resolved in favor of either party. *Anderson*, 477 U.S. at 250. Put another way, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52; *see also Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 578 (6th Cir. 2003).

> [Summary judgment is required] against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is entitled to judgment as a matter of law because the nonmoving party has failed to make a sufficient showing of an essential element of [his] case with respect to which [he] has the burden of proof.

*Celotex,* 477 U.S. at 322–23 (internal quotation marks and citation omitted).

9

### III. DISCUSSION

The ADEA makes it unlawful for an employer to "discharge any individual or otherwise discriminate against any individual . . . because of such individual's age[.]" 29 U.S.C. § 623(a)(1). A plaintiff bringing an ADEA claim "must prove that age was a determining factor in the adverse action that the employer took against him or her." *Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1023 (6th Cir. 1993) (citing *Kraus v. Sobel Corrugated Containers, Inc.*, 915 F.2d 227, 299–30 (6th Cir. 1990)). The Supreme Court has held that the ADEA does not permit "a mixed-motives" claim; instead, a plaintiff alleging a violation of § 623(a) must prove by a preponderance of the evidence that "'age was the 'but-for' cause of the employer's adverse action.'" *DeBra v. JPMorgan Chase & Co.*, 749 F. App'x 331, 336 (6th Cir. 2018) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175, 177, 129 S. Ct. 2343, 174 L. Ed. 2d 119 (2009)).

#### A. Direct Evidence of Age Discrimination

Age discrimination may be established by either direct or circumstantial evidence. Harris does not suggest that he presented direct evidence of age discrimination, and the Court concludes that the alleged remarks of his union president and "others" unidentified in the record do not constitute direct evidence.

"Direct evidence is evidence that proves the existence of a fact without requiring any inferences." *Rowan v. Lockheed Martin Energy Sys., Inc*., 360 F.3d 544, 548 (6th Cir. 2004) (citing, among authority, *Manzer v. Diamond Shamrock Chem. Co*., 29 F. 3d 1078, 1081 (6th Cir. 1994)). Determining whether a statement constitutes direct evidence of age discrimination requires an evaluation based on the following factors:

> (1) whether the statements were made by a decision-maker or by an agent within the scope of his employment; (2) whether the statements were related to the decision-making process; (3) whether the statements were more than merely vague, ambiguous or isolated remarks; and (4) whether they were made proximate in time to the [adverse employment action].

*Peters v. Lincoln Elec. Co*., 285 F.3d 456, 478 (6th Cir. 2002) (citing *Cooley v. Carmike Cinemas, Inc*., 25 F.3d 1325, 1330 (6th Cir. 1994)). "No single factor is necessarily dispositive and courts should 'tak[e] all of the circumstances into account.'" *Smith v. Chester Cty. Bd. of Educ*., 218 F. Supp. 3d 619, 624 (W.D. Tenn. 2016) (alteration in original) (quoting *Peters*, 285 F.3d at 478).

In his complaint, Harris alleged that his union steward told him that the company would save money if it terminated his employment and that the union steward and "others" inquired about his retirement plans. (Doc. No. 1 ¶¶ 14, 17.) In his deposition, however, he admitted that only his union steward, Travis Harris, made inquiries or comments regarding retirement. (Doc. No. 28-1 at 84–86.) These statements, made by a non-decisionmaker with no managerial authority over Harris, cannot constitute direct evidence of age discrimination because they do not necessarily support an inference that age was the reason Pentair terminated Harris. *See Rowan*, 360 F.3d at 548. "Only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age . . . constitute direct evidence of discrimination." *Suslovic v. Black & Decker, Inc*., No. 1:06-cv-116, 2007 WL 2153277, at *6 (N.D. Ohio July 23, 2007) (quoting *Carter v. City of Miami*, 870 F.2d 578, 581–82 (11th Cir. 1989)). Indeed, inquiries concerning an employees' retirement plans, even from a supervisor, alone "do not constitute direct evidence of age discrimination." *See Lefevers v. GAF Fiberglass Corp*., 667 F.3d 721, 724 (6th Cir. 2012).

Moreover, "[i]f discriminatory statements are offered as direct evidence of discrimination, those statements 'must come from [the] decisionmakers' responsible for the adverse employment decision. 'Statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself cannot suffice to satisfy the plaintiff's burden[.]" *Richardson v. Wal-Mart Stores, Inc*., 836 F.3d 698, 703 (6th Cir. 2016) (quoting *Geiger v. Tower Auto.*, 579 F.3d 614, 620–21 (6th Cir. 2009)). These isolated and stray remarks by a non-managerial union steward cannot establish the existence of direct evidence of age discrimination.[6] *See also White v. Columbus Metro. Hous. Auth*., 429 F.3d 232, 239 (6th Cir. 2005) ("Isolated and ambiguous comments are insufficient to support a finding of direct discrimination.").

### B.    Circumstantial Evidence of Age Discrimination

Nevertheless, even without direct evidence of age discrimination, Harris can prevail on his ADEA claim through the presentation of circumstantial evidence. Circumstantial evidence "is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Geiger*, 579 F.3d at 620 (quoting *Wexler*, 317 F.3d at 570).

The Court applies the evidentiary framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), to analyze ADEA claims based on circumstantial evidence. "Under that framework, a plaintiff must produce enough evidence to

---

[6] The union steward's purported belief that the company would save money if it discharged Harris also cannot constitute direct evidence of age discrimination. Harris acknowledged that an employee's rate of pay (as set by the CBA) and seniority was not related to his age but rather, was a function of the employee's length of service with the company and that a younger employee could enjoy a higher rate of pay based on his years of experience. (Doc. No. 28-1 at 87–88; *see* Doc. No. 35 ¶ 21.)

establish a prima facie case of age discrimination, namely: '(1) membership in a protected group; (2) qualification for the job in question; (3) an adverse employment action; and (4) circumstances that support an inference of discrimination.'" *DeBra*, 749 F. App'x at 336 (quoting *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283 (6th Cir. 2012) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002))).

Once the plaintiff establishes a prima facie case, a presumption of discrimination arises and "the burden of production shifts to the defendant to articulate a non-discriminatory reason for its action." *Burzynski v. Cohen*, 264 F.3d 611, 622 (6th Cir. 2001). If defendant articulates a nondiscriminatory reason, the presumption is rebutted, and the burden shifts back to plaintiff to show that the reason was a pretext for age discrimination. *Id.* At all times during this burden shifting process, the plaintiff retains the ultimate burden of producing "sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants intentionally discriminated against him." *Johnson v Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003) (alteration in original).

### 1.  *Prima Facie Case and Legitimate, Nondiscriminatory Reason*

Pentair concedes, for the purposes of summary judgment, that Harris can establish a prima facie case of discrimination (*see* Doc. No. 30 at 19), so the burden shifts to Pentair to articulate a non-discriminatory reason for his discharge. Pentair maintains that it discharged Harris because of his history of safety violations. (Doc. No. 30 at 6 [Harris' "inability, or refusal, to correct his behavior, including repeatedly operating his power forklift at unsafe heights, ultimately necessitated his separation of employment from the Company."]; Doc. No. 32-2 at 10.) It is well settled that an employee's violation of a company's safety rules or code of conduct

is a legitimate reason supporting termination. *See Chattman v. Toho Tenax Am., Inc*., 686 F.3d 339, 349 (6th Cir. 2012). Because Pentair's burden is "merely a burden of production, not of persuasion . . . it does not involve a credibility assessment." *Upshaw v. Ford Motor Co*., 576 F.3d 576, 585 (6th Cir. 2009). For this reason, Pentair's proffered legitimate, nondiscriminatory reason for Harris' firing—repeated violation of the company's safety rules—satisfies its burden of production. Thus, the burden shifts back to Harris to demonstrate pretext.

        2.    *Pretext*

     In order to avoid summary judgment on this final prong of the *McDonnell Douglas* analysis, Harris must show that there is a genuine dispute of material fact from which a jury could reasonably find that Pentair's stated reason for his termination is pretextual, and that the real reason is unlawful age discrimination. In the Sixth Circuit, "a plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, and (3) that they were insufficient to motivate the employer's action." *Chen v. Dow Chem. Co*., 580 F.3d 394, 400 (6th Cir. 2009); *see Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012). These three categories are not rigid or limiting factors for determining pretext, but rather guidelines for focusing on the ultimate inquiry: did the employer make up those reasons to conceal unlawful age discrimination. *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012) (citing *Chen*, 580 F.3d at 400 n.4). Harris attempts to establish pretext through each of the three enumerated methods. "Whichever method the plaintiff employs, he always bears the burden of producing sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that the defendant [] intentionally discriminating against him." *Seeger*, 681 F.3d at 285

14

(alterations in original) (quotation marks and citation omitted).

a.     No Basis In Fact

The first avenue for establishing pretext—no basis in fact—is essentially an attack on the credibility of Pentair's reason and "consists of showing that the employer did not actually have cause to take adverse action against the employee based on its proffered reason, and thus, that the proffered reason is pretextual." *Id.* at 285 (citation and quotation marks omitted); *see Alberty v. Columbus Twp.*, 730 F. App'x 352, 356 (6th Cir. 2018) (Plaintiff is required to present evidence that shows that the reasons given by the defendant for the discharge "simply did not happen.") (quotation marks and citation omitted). As previously noted, Harris vehemently denies that he violated any of the company's safety rules and further insists that at no time did he operate his forklift in an unsafe manner. (Doc. No. 35 ¶¶ 10, 18–19; *see* Doc. No. 28-1 at 33, 36, 41, 57, 64–65, 67, 71; *see also* Doc. No. 35 ¶¶ 7–8, 13.)

Pentair argues that, regardless of whether Harris disputes the factual accuracy of the discipline he received, the company has a right to rely on its honest belief that Harris violated its safety rules. (Doc. No. 30 at 20–22.) "Where an employer can demonstrate an honest belief for its proffered reason . . . the inference of pretext is not warranted." *Joostberns v. United Parcel Servs., Inc.*, 166 F. App'x 783, 791 (6th Cir. 2006). "Under the honest belief rule, an employer's proffered reason is considered honestly held where the employer can establish it 'reasonably reli[ed] on particularized facts that were before it at the time the decision was made.'" *Id.* (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1994)). "To overcome the employer's invocation of the honest belief rule, the employee 'must allege more than a dispute over the facts upon which [the] discharge was based. He must put forth evidence which

15

demonstrates that the employer did not honestly believe in the proffered non-discriminatory reason for its adverse employment action.'" *Blizzard*, 698 F.3d at 286 (quoting *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001)). In support of its honest belief, Pentair cites to the reports of Fortney and Olney that they (and other management-level employees) had witnessed Harris violating safety procedures on numerous occasions.[7] (Doc. No. 30 at 20–21 [citing, among authority, *Chen*, 580 F.3d at 401 ("Absent a reason to doubt the validity of these reports, [defendant] was entitled to rely on this information in deciding to terminate [plaintiff's] employment and acted reasonably in doing so.")].); *see, e.g., Tschappatt v. Crescent Metal Prods., Inc.*, No. 1:17-cv-337, 2019 WL 1558747, at *8 (N.D. Ohio Apr. 10, 2019) (finding employer "had an honest belief that justified termination because [the employee] had amassed both formal rule violations as well as many informal disciplinary actions").

As evidence of pretext under this first method, Harris alleges that "[n]one of the false disciplines that I received were ever investigated. I was simply accused of wrongdoing, and I was not even asked if the alleged incidents occurred. This failure to investigate is contrary to the workplace policies, practices, procedures and customs of [Pentair]." (Doc. No. 35 ¶ 13.) But the Court does "not require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed

---

[7] Harris suggests that Pentair is not entitled to the protections of the honest belief rule because he is not arguing that the disciplinary decisions were in hindsight mistaken, foolish, trivial or baseless, but rather that the reason given for each decision was not the actual reason. (Doc. No. 34 at 15.) *Cf. Smith*, 155 F.3d at 806 (Under the honest belief rule, an employee cannot establish pretext "even if the employer's reason is ultimately found to be mistaken, foolish, trivial, or baseless."). However, as set forth above, the record is clear that Harris is arguing both that the alleged "false reasons" given for his discipline were baseless *and* that the reasons given were not the real reasons. Accordingly, the Court will consider Harris' arguments and evidence as they related to each of the possible methods for establishing pretext, recognizing that the honest belief rule is not a defense to the second and third methods. *See Joostberns*, 166 F. App'x at 794 n.5 (honest belief rule only applies to the first method); *see e.g., Anderson v. Target Stores, Inc.*, No. 2:19-cv-2889, 2021 WL 2639026 (W.D. Tenn. June 25, 2021) (considering pretext under all three methods and utilizing the honest belief rule as to the "no basis in fact" method).

and considered decision before taking an adverse employment action." *Smith*, 155 F.3d at 807; *see Smith v. Towne Props. Asset Mgmt. Co., Inc*., 803 F. App'x 849, 852 (6th Cir. 2020) ("[A]n 'optimal investigation—i.e., interviewing the employee and some or all of [her] witnesses—is not a prerequisite to application of the honest belief rule.'") (quoting *Seeger*, 681 F.3d at 286).

In support of his argument that none of his disciplines—including the discipline immediately preceding his discharge—were investigated, Harris also relies on the testimony of Human Resource Specialist Hite who indicated that there was no write-up from any human resources employee regarding the disciplines received. (*See* Doc. No. 34 at 8 [citing Doc. No. 32-1 at 31–34].) However, Harris misconstrues Hite's testimony. Hite merely testified that the company typically gathers statements from any potential witnesses and the supervisor and then places the information before the human resources department. (Doc. No. 32-1 at 31.) Here, the record shows that each disciplinary action was witnessed by either Harris' supervisor, Fortney, another supervisor, Olney, or the plant manager. Fortney testified that when this happens, the supervisor usually just writes up the incident and lets the employee grieve the resulting discipline. (Doc. No. 31-1 at 23–4.) Harris has not identified any other potential witnesses (besides himself) to the events in question that should have been asked to provide statements, and it was undisputed that the company held a disciplinary meeting in connection with each of the five formal disciplinary actions where Harris was present with his union representative and had the opportunity to contest or grieve the discipline.[8] (*Id*. at 23–24.) Because the incidents were all witnessed by management-level employees, there was simply nothing further to

---

[8] In his deposition, Harris identified another employee, Littleton Lloyd, who had "some kind of information of what's going on[.]" (Doc. No. 28-1 at 9, 78.) While he claims that Lloyd knew that Pentair was not "treating [Harris] right[,]" he does not claim that Lloyd was an eye witness to any of the alleged safety violations. (*Id*.)

investigate, and Harris' challenges to the quality of the investigations are unavailing. *See Tschappatt*, 2019 WL 1558747, at *8 (reasoning that the plaintiff's supervisor's personal eye-witness of the violation was sufficient to make discharge decision).

b.      Not Actually Motivated By

A plaintiff can also prove pretext under the second method by showing that the asserted reason did not actually motivate the defendant. *See Manzer*, 29 F.3d at 1084. This line of attack "admits that the [proffered] reason could motivate the employer but argues that the illegal reason is more likely than the proffered reason to have motivated the employer." *Joostberns*, 166 F. App'x at 791 (citing *Manzer*, 29 F.3d at 1084). Under this method, the plaintiff must show "that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." *Manzer*, 29 F.3d at 1084. "The honest belief rule does not apply when the plaintiff relies on the second method of showing pretext, that the stated reason did not actually motivate [his] termination." *Poe v. Brunswick Corp.*, No. 1:17-cv-202, 2019 WL 2753985, at *9 (E.D. Tenn. July 1, 2019) (citing *Joostberns*, 166 F. App'x at 794 n.5).

Harris' reliance on this second method is problematic given that he denies that he violated any of the safety rules alleged by Pentair. (Doc. No. 35 ¶¶ 10, 18–19; Doc. No. 1 ¶¶ 15, 16, 19; *see* Doc. No. 28-1 at 33, 36, 41, 57, 64–65, 67, 71; *see also* Doc. No. 35 ¶¶ 7–8, 13.) "Indeed, the Sixth Circuit has sometimes refused to even consider the 'did not actually motivate' method of pretext where the plaintiff did not admit the underlying factual basis." *Hartman v. Dow Chem. Co.*, No. 13-cv-14774, 2014 WL 7338722, at *9 (E.D. Mich. Dec. 22, 2014) (citing *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 349 (6th Cir. 2012) ("Chattman, however, does

18

not admit the factual basis underlying Toho's proffered legitimate reason for his discipline, which eliminates [this] category of pretext.")). Nevertheless, in a somewhat analogous situation, the Sixth Circuit reached the merits of a "did not actually motive" pretext argument despite the fact that the plaintiff did not admit the alleged factual basis underlying the defendant's stated reason. *See Blizzard*, 698 F.3d at 287 n.6 (noting, however, that the "did not actually motivate" method was somewhat incompatible with plaintiff's denial of the underlying factual basis for the termination).

To the extent that Harris is permitted to argue this method while simultaneously contesting the truth of the alleged safety violations, the Court finds that he has failed to demonstrate that Pentair was not actually motivated by any safety violations. Harris claims that, shortly after he bid for and was awarded the forklift position, "management began to watch [him] more closely than before [he] was awarded the position, and [he] began to receive written disciplines for false and fabricated reasons." (Doc. No. 35 ¶ 7.)

At his deposition, Harris conceded that he did not have any evidence that the alleged increased scrutiny he received was as a result of his age. (Doc. No. 28-1 at 82.) Instead, he speculates that "management and certain younger co-workers simply did not like [him] and were resentful that they could not prevent [him] from receiving the tow motor position based upon [his] seniority which was based upon [his] time on the job." (Doc. No. 35 ¶ 21; *see* Doc. No. 28-1 at 73–75 (noting that other employees did not like him and speculating that it was because of his age). However, not liking an employee is not evidence of age discrimination. *See Norbuta v. Loctite Corp.*, 1 F. App'x 305, 313 (6th Cir. 2001). Moreover, to the extent that Harris has alleged that his co-workers were resentful because of his seniority that enabled him to obtain the

19

forklift operator position (*see* Doc. No. 35 ¶ 21), Harris has conceded that seniority and pay is based on years of service and not an employee's age. (Doc. No. 28-1 at 87–88; *see* Doc. No. 35 ¶ 21.)

Further, for all the reasons previously stated, neither the comments of a non-management level union steward, nor breadth of the internal investigations, support the conclusion that Harris' discipline was motivated by his age. Indeed, the Court finds that Harris has failed to point to anything in the record that would support his speculation that the motivation behind his discipline and discharge was his age rather than his alleged safety violations. He cannot, therefore, establish prejudice under the second method.

### c.      Insufficient to Motivate

This leaves the third method for proving pretext, which, similar to the first method, represents an attack on the credibility of the employer's proffered reason. *Manzer*, 29 F.3d at 1084. And like the second method, the third avenue for establishing pretext "admits that the employer's proffered reason has basis in fact but denies that it created sufficient cause for the adverse employment action." *Joostberns*, 166 F. App'x at 791 (citing *Manzer*, 29 F.3d at 1084). "It 'ordinarily consists of evidence that other employees . . . were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff.'" *Id.* (quoting *Manzer*, 29 F.3d at 1084).

Harris points to a younger forklift operator, Jason Cooley, who was not discharged even though his negligent operation of a forklift caused $1,000.00 of damage. (Doc. No. 34 at 23; *see* Doc. No. 31-2 at 38–39, 65–67.) However, Harris was not discharged for one alleged safety violation involving his forklift; he was discharged for his record of repeated violations. (*See* Doc.

No. 32-2 at 10.) The disciplinary history of an employee is a crucial variable in determining whether an employee will be disciplined for a particular infraction, especially under a "progressive discipline" scheme. *See Berry v. City of Pontiac*, 269 F. App'x 545, 550 (6th Cir. 2008) (concluding that the plaintiff was not similarly situated with a comparator with fewer instances of discipline under a progressive discipline system). There is nothing in the record to suggest that Cooley had a history of safety or rules violations. Because the record shows Harris was responsible for a history of repeated safety violations, it cannot be said that Cooley's one violation was "substantially identical" to the numerous violations committed by Harris. *Blizzard*, 698 F.3d at 287; *see Ortiz v. Hershey Co*., 580 F. App'x 352, 357 (6th Cir. 2014) (employee not comparable to plaintiff where employee did not have a "comparable record" of quality control violations); *see, e.g., Moore v. Ohio Edison Co., Inc*., 4:15-cv-1424, 2016 WL 7097631, at *8 (N.D. Ohio Dec. 3, 2016) (noting that "[n]o other employee had a history of performance issues and disciplinary problems that rivaled plaintiff's record, and this fact serves to further distinguish plaintiff from his proposed comparators"); *see also Ercegovic v. Goodyear Tire & Rubber Co*., 154 F.3d 344, 352 (6th Cir. 1998) (describing similarly situated employees as individuals who "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it") (internal quotation marks omitted). For this reason alone, Harris cannot demonstrate that his safety violations were insufficient to warrant discharge.

Moreover, to the extent he complains that Cooley's one violation was treated leniently by Fortney, the record reflects that Harris was also the regular beneficiary of leniency by Fortney and other managers. As previously noted, Harris received numerous and undocumented

21

counseling and coaching sessions from Fortney before any form of discipline was documented, as Fortney explained that he did not like to write-up any employee. (Doc. No. 31-1 at 20–22.) And a written warning for violating a safety procedure was later downgraded to a documented counseling because Fortney did not want to have to take the next step in the progressive disciplinary process and suspend Harris. (*Id*. 49–50.) Even when Harris could have been discharged for a subsequent safety violation, the company exercised restraint. (*See* Doc. No. 30 at 14.) Rather than any evidence of age animus, the record contains repeated instances where Pentair gave Harris opportunities to improve his performance before it ultimately terminated his employment. This additional evidence only serves to reinforce the conclusion that Harris was not the victim of age animus.

## IV. CONCLUSION

Considering all of the evidence together, the Court finds that Harris has failed to create a genuine issue of material fact as to whether his discharge was motivated by his age. Accordingly, Pentair's motion for summary is granted and this case is dismissed.

**IT IS SO ORDERED**.

Dated: August 17, 2021

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**

22